# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **WAYNE MOORE AND KIMBERLY MOORE,** | **CIVIL ACTION** |
| **Plaintiffs,** | |
| v. | **NO. 14-3113** |
| **STATE FARM FIRE AND CASUALTY COMPANY,** | |
| **Defendant.** | |

## **MEMORANDUM OPINION**

This lawsuit, which arises from an electrical fire at Plaintiffs' home, involves claims by Mr. and Mrs. Moore ("the Moores") against their homeowners' insurance carrier, Defendant State Farm Fire and Casualty Company ("State Farm"). Plaintiffs allege that State Farm breached the insurance contract and acted in bad faith by refusing, without reasonable basis, to pay all amounts to which Plaintiffs are entitled under their insurance policy and applicable law. State Farm contends that it thoroughly and properly investigated the incident for all covered damages in accordance with the terms of the policy as interpreted by Pennsylvania law.

Currently before the court are three motions to exclude the testimony of each of Plaintiffs' three experts. The proposed experts are: (1) Paul Maher, a structural and architectural consultant who offered an opinion about the scope of repairs needed to return the structural integrity of the property; (2) John Cavanaugh, whose testimony is offered by Plaintiff to show the cost of mold remediation as shown by an estimate prepared by the company for which he

works, INX Technology Corporation; and (3) Brian Kelly of Brian Kelly Home Remodeling to testify as to the cost to repair, replace and rebuild the property.

The Federal Rules of Evidence govern the admission of expert opinions in a federal case. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 587-89 (1993); *United States v. Schiff*, 602 F.3d 152, 172-73 (3d Cir. 2010). Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In a motion brought pursuant to Rule 702, Plaintiffs bear the burden of demonstrating by a preponderance of the evidence that the opinions of their proposed experts are admissible. *In re Paoli R.R. Yard PCB Litig.* ("*Paoli II*"), 35 F.3d 717, 743-44 (3d Cir. 1994), *cert. denied*, 513 U.S. 1190 (1995). In deciding the motion, the Court acts as gatekeeper to determine, initially, whether the proposed testimony of Plaintiffs' expert witnesses is relevant, reliable, and helpful to the jury's evaluation of such evidence. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151 (1999); *Daubert*, 509 U.S. at 597. The touchstones of the inquiry are "qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). The "qualifications" requirement is liberally interpreted and includes "a broad range of knowledge, skills, and training." *Paoli II*, 35 F.3d at 741. Nevertheless, an expert "must first be qualified by virtue of specialized expertise." *Elcock*, 233 F.3d at 740-41.

The reliability inquiry goes to the question of whether the "'*process or technique* [as opposed to the conclusion] the expert used in formulating the opinion is reliable.'" *In re TMI Litig.*, 193 F.3d 613, 664 (3d Cir. 1999) (quoting *Paoli II*, 35 F.3d at 742) (emphasis and modification in *In re TMI*). The expert's testimony "must be based on 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *Paoli II*, 35 F.3d at 741-43 (quoting *Daubert*, 509 U.S. at 590). The mode of evaluating the methods and procedures employed by the expert is flexible, but in doing the Court looks to a number of factors including:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Paoli II,* 35 F.3d at 742 n.8.

Finally, Rule 702 requires that the testimony proposed by the expert must be helpful in the context of the case in which it is offered. It other words it must "fit" the issues in the case in being relevant and able to assist the trier of fact. *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). The standard for analyzing the fit of an expert's analysis to the case at hand is "not that high." *United States v. Ford*, 481 F.3d 215, 219-20 (3d Cir. 2007) (citation omitted). But, expert testimony can be powerful and misleading because of the difficulty in evaluating it, and, thus, the Third Circuit has cautioned that district courts should tread carefully when evaluating proffered expert testimony, paying special attention to this, the relevance prong of *Daubert*. *Id.* at 219 n.6.

3

**Paul Maher**[1]

Paul Maher, who described himself as a "structural and architectural consultant" on his letterhead, visited the Plaintiffs' home in October 2013, five months after the fire, to "identify and evaluate the damage to the Moore home." Pls.' Opp. to Mot. in Limine, Paul Maher ("Pls.' Opp., Maher"), Ex. A at 1. He walked around the house and observed in a write-up of his visit, which Plaintiffs refer to as his expert report, that there were charred rafters in the upper hallway attic, that there was "an obvious smell of dampness, mildew and or mold" in the second floor hallway, that he saw mold on the walls in three bedrooms and "signs of mold and water damage" on the gable walls in the roof area. *Id.* He noted that "[t]he smell of smoke in these areas was also very strong." *Id.* And, he reported that Mr. Moore told him that the "water heater in the basement had been submerged in water . . . for approximately 2 months." *Id.* He then reached a series of "conclusions" regarding what needed to be done in order, in his "professional option, [sic]" to "return the structural integrity to the home." *Id.* They included bringing in a mold consultant to inspect and remediate the mold problem, replacing the charred beams and rafters, and replacing the water heater "because of internal water damage." *Id.*

There is scant information in his report regarding Mr. Maher's qualifications. Apart from the reference to himself on his letterhead as a "structural and architectural consultant" he also appends the initials "P.E." to his name. State Farm surmises that the initials may be an abbreviation for "Professional Engineer." Def.'s Mot. in Limine, Paul Maher ("Def's. Mot., Maher") ¶ 14. If it is in fact the case that Mr. Maher is a professional engineer and provides consulting services as such, he is qualified to opine regarding the "scope of repairs [needed to]

---

[1] At a telephonic conference on September 29, 2015, the Court was informed that Mr. Maher is now deceased. Nevertheless Plaintiffs' attorney indicated that he may seek to have his report introduced in an alternative manner (although he did not identify the alternative). Thus, although Mr. Maher is no longer available to testify, the evidentiary analysis of his report under Rule 702 and *Daubert* remains relevant and must, therefore, be addressed.

4

return the structural integerty [sic] to the home." Pls'. Opp., Maher, Ex. A at 2. However, an analysis of his report shows that the conclusions he reaches are unreliable under the *Daubert* and Rule 702 framework. That conclusion is reached by an analysis of his conclusions concerning mold, charred wood and damage to a water heater in the basement.

With respect to the heater in the basement, Plaintiffs explain in their responsive brief that Mr. Maher's testimony is not, they say, being offered for the purpose of proving "there was water in the basement" or regarding the cause of water in the basement. Pls.' Opp., Maher ¶ 9. Indeed, in his report he accepted at face value the Mr. Moore's representation that "[t]he water heater in the basement had been submerged in water . . . for approximately 2 months." Pls.' Opp., Maher, Ex. A at 1. His report contains no indication as to whether he saw any water in the basement when he walked through the home, nor does it contain any description of what processes or techniques he used to conclude that the heater had been water-logged. Taking his report at face value, he conducted no testing, inspection or physical examination of the water heater, but simply concluded based on his conversation with Mr. Moore that: "[t]he water heater should be replaced because of internal water damage. The water heater should sit on 8 inch concrete block." *Id* at 2. Absent indication in the report that Mr. Maher used his own expertise through methods and procedures familiar to his profession, any testimony offered through him regarding the state of the water heater is unreliable.

His testimony concerning the charred rafters is similarly lacking in reliability. His evaluation consisted solely of the following: He walked through the home. He noted that "a fire . . . appeared to have started in the upper hallway attic vicinity because that area revealed charred rafters and menbers [sic]" and that there was a "strong" smell of smoke. *Id* at 1. From that he concluded that "[a]ll charred menbers [sic] shall be replaced," and that "[t]he roof rafters

5

and the sheathing should be replaced were [sic] needed." *Id* at 2. Although Mr. Maher reached a conclusion that the fire must have started in the attic, his report contains no explanation of any established methodology he may have used in reaching that conclusion. *See e.g.*, *Hoang v. Funai Corp. Inc.,* 652 F. Supp. 2d 564, 567-68 (M.D. Pa. 2009) (describing established methodology used by expert in investigating the cause and origin of a fire). And, although he concludes that some charred structural components had to be replaced, he provides only a general observation to support that conclusion. These conclusions are nothing more than an astute and observant layperson would make by the use of her senses of sight and of smell combined with a dose of common sense.

Mr. Maher's conclusions with respect to mold fare no better. His report shows that in walking through the house he smelled and saw what he thought was mold. Pls.' Opp., Maher, Ex. A at 1. But, he did not perform any testing to determine whether it was in fact mold. What he did do was to include that someone who had expertise in identifying and remediating mold—what he referred to in his report as a "Mold Consultant"—should "perform an inspection, mitiation [sic] and remediation plan to address the mold problem." *Id.* He further recommended that "[a]ll the walls in the bedrooms should be inspected behind the sheathing to discount mold or mildew present," *id.*, but did no inspection himself.

Accordingly, because Mr. Maher's report is not reliable, his report and any expert testimony based on his report shall be precluded.

**John Cavanaugh**

Defendant also seeks to exclude the expert report and testimony of John Cavanaugh who, on October 15, 2015, submitted to Mr. Moore a quotation for mold remediation. The quotation is on the letterhead of an entity called INX Technology Corporation and is signed by Mr.

Cavanaugh, who does not identify his position in the company or anything to indicate his skill set. Absent even the most basic information about the business of the company and the qualifications of Mr. Cavanaugh, Plaintiffs have not met their burden of proving that he is qualified to opine as to the matters set forth in the quotation. Even if they had done so, the quotation is simply that—a document listing work tasks and costs associated with mold remediation at the Moore's home. Although Mr. Cavanaugh does state that the document is based on a site inspection, it contains no description of any method he used to come up with the scope of work or the estimate for completion of that work or any evaluation he conducted to determine that the work listed was caused by the fire or necessary to repair the fire damage. Thus, he shall also be precluded from providing expert testimony.

**Brian Kelly**

Plaintiffs offer Brian Kelly of Brian Kelly Home Remodeling as an expert to testify about the cost of structural repairs to their fire-damaged home. The subject matter of his testimony is set forth in several "estimates" he provided to Mr. Moore in June 2013: they provide a description of the materials necessary; the labor required and the cost estimate for repairs to the kitchen, the bathrooms, interior doors, drywall, floors and subfloors, exterior walls as well as gutters and downspouts; and demolition and debris removal. Given that Mr. Cavanaugh appears to own his own remodeling company, Plaintiffs are likely to be able to show that he is an expert in the business of home remodeling. Nevertheless, as is the case with Mr. Maher and Mr. Cavanaugh, his "report" contains nothing to inform the court as to how robust his methodology was in coming up with the repair estimate. Indeed, it contains nothing at all about any methodology he may have used in reaching those estimates. Accordingly, State Farm's motion to exclude his report and testimony shall be granted.

An order in accord with this opinion follows.

**Dated**: September 30, 2015

**BY THE COURT:**

**/S/WENDY BEETLESTONE, J.**

_____

**WENDY BEETLESTONE, J.**